759 A.2d 293

**HEK PLATFORMS AND HOISTS, INC.**

v.

**NATIONSBANK, et al.**

**No. 1104, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 8, 2000.

Samuel M. Grant (David J. Preller, Jr. and Preller and Preller on the brief), Towson, for appellant.

Richard M. Goldberg (Joel I. Sher, Kimberly M. Stoker and Shapiro and Olander on the brief), Baltimore, for appellee, Orix.

Argued before EYLER, ADKINS and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

## ON MOTION FOR RECONSIDERATION

MARVIN H. SMITH, Judge, Retired, Specially Assigned.

HEK Platforms and Hoists, Inc. ("HEK") appeals from a judgment of the Circuit Court for Baltimore County adverse to its claims against ORIX Credit Alliance, Inc. ("ORIX"). We shall affirm the judgment of the trial court—and resist the

temptation to dismiss the appeal because of a totally inadequate record extract. We explain.

### FACTS

HEK manufactures and markets scaffolding equipment for use by the construction industry. While it has an office in Baltimore County, its principal place of business is in Georgia. On May 10, 1994, HEK entered into a sales contract ("the 1994 transaction") with the Proceres Companies, Inc. ("Proceres"), which was headquartered in Howard County, Maryland. The contract was memorialized by a "Conditional Sales Contract Note," which reflected that Proceres agreed to pay HEK or any assignee of HEK $230,112.00 in 36 monthly installments in exchange for seven "platforms" and "all attachments and accessories thereto." By the terms of the note, HEK or its assignee was to retain title to the equipment until the note was paid in full. Proceres executed a guaranty of the note, as did Proceres's president, J. Wickham Zimmerman, and vice president, James V. Blimmel.

The purchase by Proceres was financed by ORIX. Thus, when Proceres executed the "Conditional Sales Contract Note" payable to HEK, HEK simultaneously executed an "Assignment" of the note to ORIX. Under the terms of the "Assignment," ORIX was to pay $200,000.00 to HEK upon delivery of the scaffolding equipment to Proceres.

HEK purported to deliver the equipment to Proceres on May 23, 1994. On June 1, 1994, in order to perfect its purchase money security interest in the equipment, ORIX prepared financing statements and drafted checks for filing with the Maryland State Department of Assessments and Taxation ("SDAT") and the Clerk of the Circuit Court for Howard County. The financing statement filed with SDAT was stamped "RECORDED" on June 1, 1994. The statement filed with the Circuit Court for Howard County, however, was not date-stamped until June 17, 1994.

Sometime after May 23, 1994, Proceres informed both HEK and ORIX that some of the equipment that had been delivered

was damaged, and that HEK had failed to deliver 300 of the "mast bolts" that were necessary to the construction of the scaffolding. ORIX refused to pay HEK the $200,000.00 due on the "Assignment" until the situation was rectified, and HEK agreed to repair or replace the damaged parts and to deliver the 300 bolts. Although Proceres was able to construct some of the scaffolding immediately upon the delivery of May 23, 1994, all of the scaffolding could not be constructed until late June or early July, when the additional bolts were delivered and the damaged parts were repaired or replaced. ORIX paid HEK for the "Assignment" by check dated July 5, 1994.

In October and November of 1996, Proceres failed to make payments to ORIX. ORIX therefore believed it had the right to "repossess" the scaffolding equipment. Rather than do so itself, however, ORIX, through its Baltimore branch manager, John Frank, contacted HEK's sales manager, Dennis Morgan, and later HEK's president, Eric Schmidt. The men negotiated a deal ("the 1996 transaction") whereby HEK was to pay ORIX $73,926.00—the remaining amount owed to ORIX by Proceres—in exchange for ORIX's right to the equipment. In a November 19, 1996 letter to Frank, Schmidt summarized the agreement as follows:

> I would like to confirm the following information that has been related to me through communications between ORIX Credit Alliance and HEK Platforms & Hoists regarding reassignment of the May 10, 1994, Conditional Sale Contract Note from The Proceres Companies, Inc. (Buyer) to HEK Platforms & Hoists, Inc. (Seller). This contract note had been assigned to ORIX Credit Alliance, Inc., on May 10, 1994.
>
> 1. ORIX Credit Alliance is reassigning the contract note to HEK Platforms & Hoists at a discount rate because the note is in default.
>
> 2. The Proceres Companies have been notified of the default status of the note.

3. The Proceres Companies have failed to correct the default. Therefore, the note has been accelerated, the balance is due and payable, and the equipment is subject to repossession by the terms of the agreement.

4. The Proceres Companies have communicated to ORIX Credit Alliance that ORIX should come and get the equipment as it is on the wall 75 ft in the air.

5. ORIX Credit Alliance has a secured interest in the equipment by the terms of the contract note.

HEK wired the $73,926.00 to ORIX on November 22, 1996. On Sunday, November 24, 1996, HEK work crews went to Proceres's job site in Tyson's Corner, Virginia and retrieved the scaffolding equipment. The work crews immediately transported the equipment to HEK's office in Atlanta, Georgia.

On Monday, November 25, however, counsel for HEK received a phone call and, later, a telefaxed letter from counsel for Nationsbank. Counsel for Nationsbank asserted that Nationsbank had "a blanket lien on all of Proceres' assets," that ORIX had failed to properly perfect its purchase money security interest in the scaffolding equipment in question, and that Nationsbank therefore had the superior claim. Counsel for Nationsbank asserted that Nationsbank had a buyer for the equipment and demanded that HEK return it immediately.

That same day, HEK's president, Schmidt, received, via Federal Express, a writing from ORIX's Baltimore branch manager, Frank, that memorialized the transaction that had occurred the previous week. The writing, which was captioned "Assignment," consisted of a preprinted form dated November 22, 1996 and signed by Frank. It stated:

THE UNDERSIGNED, ORIX CREDIT ALLIANCE, INC., Assignor, hereby assigns to *HEK Platforms and Hoists, Inc.* (hereinafter called "Assignee"), without recourse and without any representations and warranties, express, implied, or statutory, all of its right, title and interest in and to the following contract or agreement:

CONDITIONAL SALE CONTRACT NOTE, dated May 10, 1994 with HEK Platforms & Hoists, Inc. As Seller and The Proceres Companies, Incorporated As Buyer.

It is a condition of this Assignment, and Assignee by accepting this Assignment hereby agrees that Assignor and its respective successors shall be and are hereby unconditionally released by Assignee, its successors and assigns from any and all claims, liabilities and obligations arising out of and/or in connection with the above described contract or agreement.

Schmidt contacted Frank about Nationsbank's claim, and Frank told him that "there must be some mistake" and that he "would have to check into it." Subsequently, Proceres sent a letter to ORIX and to its other creditors, expressing its apparent belief that "Nationsbank ... has a first priority blanket lien on all assets of [Proceres]." Nationsbank, meanwhile, continued to press for the return of the scaffolding equipment. In February of 1997, before Frank or anyone else connected with ORIX responded to Schmidt's concerns regarding the superiority of ORIX's purchase money security interest, HEK filed suit in the Circuit Court for Baltimore County against Nationsbank and ORIX. HEK sought, *inter alia,*

—a declaratory judgment that Orix's purchase money security interest in the equipment was superior to Nationsbank's blanket lien,

—in the event that Nationsbank had the superior interest, a determination that ORIX breached the warranty of title in the "assignment and sale" of the scaffolding equipment to HEK,

—in the event that Nationsbank had the superior interest, a determination that ORIX breached the "assignment and sale" contract with HEK "by selling goods that were not free of any such security interest," and

—in the event that Nationsbank had the superior interest, a determination that ORIX negligently misrepresented that *it* had the superior interest.

In March of 1997, HEK amended its complaint. To the counts set forth in the original complaint, the amended complaint added, *inter alia*, a count against ORIX for fraud.[1]

In April of 1997, before trial commenced, HEK transported the scaffolding equipment from Atlanta to Maryland, where it was to be sold at auction by Nationsbank. Just prior to the auction, however, HEK purchased the equipment from Nationsbank for $75,000.00 and agreed to dismiss Nationsbank from the case. HEK did file a document on April 16, 1999, by which it dismissed, with prejudice, Nationsbank as a defendant.[2] HEK then transported the equipment back to Atlanta and sold it for $140,000.00.

A court trial took place on March 3 and 4, 1998. Despite what it had urged in its amended complaint, HEK posited that Nationsbank, rather than ORIX, had the superior security interest in the equipment and that HEK was therefore entitled to recover against ORIX. At the close of HEK's case in chief, the trial court granted ORIX's motion for judgment as to the counts alleging fraud and negligent misrepresentation. At the close of the entire case, the court entered judgment in favor of ORIX as to the remaining counts as well. The court determined that ORIX, rather than Nationsbank, had the

---

1. HEK also named Blimmel and Zimmerman as defendants in the original complaint, and Proceres, Blimmel and Zimmerman as defendants in the amended complaint. HEK sought to recover against the three on the written guaranties they executed in connection with the 1994 transaction. Those three defendants did not participate in the trial below, however, and judgment was not entered at that trial as to the counts against them. HEK moved for summary judgment against Proceres, Zimmerman, and Blimmel in February of 1999, after this Court dismissed HEK's initial appeal from the judgment in favor of ORIX on the ground that that judgment did not dispose of all of the claims against all of the defendants. The trial court subsequently learned that defendant Zimmerman had filed a petition in bankruptcy. It dismissed, without prejudice, the case against him. The court entered summary judgment against defendants Proceres and Blimmel and in favor of HEK for $173,504.96. Those matters are not at issue in this appeal.

2. We are thus at a loss to explain why Nationsbank is named as an appellee in this case.

superior security interest. Although it was not necessary, under the amended complaint, for the court to make any further findings, the court added that the breach of warranty of title count was not supported by Nationsbank's claim that it had a superior lien, and that the breach of contract count must fail because the count assumed that there had been a sale of equipment when what had really occurred was a reassignment of contract rights. HEK timely moved to revise the judgment, but the court denied the motion without comment.

## ISSUES

In this appeal, HEK argues, in essence, that:

I. The trial court erred in finding that ORIX had a security interest superior to that of Nationsbank,

II. The trial court erred in granting judgment in favor of ORIX as to negligent misrepresentation,

III. The trial court erred in determining that the 1996 transaction was an assignment of chattel paper rather than a sale of goods, and in determining that the breach of contract count could not stand if the transaction was an assignment, and

IV. The trial court erred in determining that Nationsbank's claim of a superior interest could not support the breach of warranty of title count.

We find no merit in any of these arguments and affirm the judgment of the trial court. Because HEK's arguments as to negligent misrepresentation and breach of contract are premised on the assumption that Nationsbank held the superior security interest, and because we affirm the trial court's determination that the superior interest was held by ORIX, we need not and shall not address HEK's second and third arguments. We shall address HEK's contention that the 1996 transaction was a contract of sale rather than an assignment of chattel paper in our discussion as to the breach of warranty of title claim.

### DISCUSSION

### RECORD EXTRACT

The record extract supplied in this case is woefully deficient. Maryland Rule 8–501(c) states, in pertinent part, that "[t]he record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal...." It will quickly be perceived by reference to the questions presented that for a determination of the issues presented we need a substantial part of that which was before the trial judge. Nevertheless, the record extract in this case contains no testimony. It likewise contains none of the pleadings. It contains no docket entries. It does not contain the judgment appealed from except on the motion to exercise revisory power over the judgment. The responsibility of preparing a proper record extract rests squarely on the appellant. *See* Md. Rule 8–501(a). In light of HEK's failure to shoulder its responsibility, we are sorely tempted to dismiss its appeal.[3]

Dismissal of this appeal would be well within the proper exercise of this Court's discretion. Prior to July 1, 1993, section (*l*) of Rule 8–501 authorized appellate courts to "dismiss the appeal or make any other appropriate order" in response to an appellant's failure to file a proper record extract. Both this Court and the Court of Appeals "repeatedly dismissed appeals where an appellant's record extract or appendix was patently insufficient for a determination of the questions raised." *Prime Contractors, Inc. v. M. & C.C. of Baltimore,* 241 Md. 55, 57, 215 A.2d 214, 216 (1965). We made clear that we were "not required to ferret out from the record those materials which counsel should have printed in the [extract]." *Eldwick Homes Assoc. v. Pitt,* 36 Md.App. 211, 212, 373 A.2d 957, 957, *cert. denied,* 281 Md. 736 (1977).

---

**3.** We note that one member of the panel that heard oral argument *would* dismiss the appeal. The appellate bar should take note of this and our discussion and govern itself accordingly.

Effective July 1, 1993, the Court of Appeals transferred section (*l*) of Rule 8–501 to section (m), and softened it to read:

> *Ordinarily,* an appeal will not be dismissed for failure to file a record extract in compliance with this Rule. If a record extract is not filed within the time prescribed by Rule 8–502, or on its face fails to comply with this Rule, the appellate court may direct the filing of a proper record extract within a specified time and, subject to Rule 8–607, may require a non-complying attorney or unrepresented party to advance all or part of the cost of printing the extract. The appellate court may dismiss the appeal for non-compliance with an order entered under this section.[4]

*See* 20 Md. Reg. 665, 698–99 (Issue 8, April 16, 1993) (emphasis added). The Court added to section (c), which sets forth the required contents of a record extract, the sentence: "The fact that a part of the record is not included in the record extract shall not preclude a party or the appellate court from considering it." *Id.*

These changes were expressly "directed at reducing the voluminousness of record extracts and at alleviating problems caused by . . . over inclusion . . . of material in record extracts." 19 Md. Reg. 2249, 2266 (Issue 26, December 23, 1992) (One Hundred Twenty–Second Report of the Standing Committee on Rules of Practice and Procedure). In short, the Court hoped to deter over-inclusion of materials by lessening the chances of dismissal for under-inclusion. Nothing in Rule 8–501(c) or (m), as revised, suggests that an appellate court is no longer entitled to dismiss an appeal for under-inclusion where the omissions are egregious, however.[5] Indeed, min-

---

4. The word "ordinarily" is used by the Court of Appeals from time to time as a "safety valve."

5. As explained by Chief Judge Ogle Marbury for the Court in *Strohecker v. Schumacher & Seiler,* 185 Md. 144, 146–47, 43 A.2d 208, 209 (1945), Maryland appellate rules did not always require a record extract or appendix:

When we passed Rule 36 of this Court, doing away with the necessity of printing the record on appeal, it was done with the intention of decreasing the cost of appellate litigation. For that reason the only things required by that rule to be printed were the judgments, decree or order appealed from, and any opinion or charge of the Court. But by Rule 39, it was stated that the appendix to the appellant's brief, in addition to the above requirements, should contain such part of the record as appellant desired the Court to read. In the case before us, as will subsequently appear, the most important contention of appellant is the lack of adequate evidence to take the case to the jury. Yet he nowhere prints in the appendix to his brief the evidence bearing on the question he raises. This Court would be entirely justified in not deciding this question at all, because the appellant has not indicated by printing it, that he desires us to read this evidence and we could not pass upon the point without examining the testimony. We will not take such a drastic step in this case because the rule is new in this Court, although it has been in effect in the Federal Court for a number of years. However, *in the future, we do not intend to pass the one typewritten copy of the record from member to member of this Court so that each one may hunt up for himself what the appellant is discussing in his brief.* The parties are each required to print those parts of the record they want the Court to consider, and they should not be surprised if, in the future, the Court examines only the record printed in the appendices and decides cases on these printed portions alone. It is not our desire to limit ourselves to this, and we hope it will not become necessary, but we do not intend to permit counsel to impose upon us the burden of work, which should have been done by them.

(Emphasis added.) The then new Rule 36 was the predecessor to our present Rule 8–501.

Later, in *Brown v. Fraley,* 222 Md. 480, 483, 161 A.2d 128, 130 (1960), Chief Judge Brune said for the Court in commenting upon another predecessor of Rule 8–501: "The Rules are established to promote the orderly and efficient administration of justice and are to be read and followed." Judge Charles C. Marbury in *State Roads Comm'n v. Sharper,* 231 Md. 411, 413, 190 A.2d 647, 649 (1963), in discussing yet another predecessor to the present Rule 8–501, said for the Court: "Maryland Rule 828 b 1 specifies that the printed extract *shall* contain such parts of the record reasonably necessary for the determination of questions presented on appeal. It is noted that this section is a mandatory requirement." (Emphasis in original.)

No useful purpose would be served by our quoting or citing the numerous cases over the period of the last fifty odd years which have expressed the thoughts we have set forth above, including, specifically, that the Court did not intend to pass the record around from member to member. Lawyers should understand that in this State, an appellate opinion represents the collective judgment of those judges who heard the case. Short of passing the record around from judge to judge or reproducing parts of the record and circulating such parts, as we have done in this case (something which should not be our burden), there is no way under the sun that the collective judgment of those hearing a case can be brought to bear on the matter before the Court unless

utes of the Court of Appeals' Standing Committee on Rules of Practice and Procedure—which recommended the 1993 changes to Rule 8–501 to the Court—reflect that the Committee believed that an appeal could still be dismissed if the omission of materials was the result of bad faith or if the appellant could not have reasonably believed that the omitted materials were unnecessary. Moreover, Rule 8–602(a)(8) continues to provide, as it provided prior to the 1993 revision of Rule 8–501, that "[o]n motion of on its own initiative, the Court may dismiss an appeal [if] ... the ... content ... of a ... record extract *does not comply with Rule ... 8–501....*"

■ We are convinced that it was not reasonable for HEK to believe that it was unnecessary to include in the record extract those portions of the trial transcript concerning facts in dispute and the decision of the trial judge. Nor could HEK have reasonably believed that it was unnecessary to include a copy of the amended complaint. We are satisfied, in light of counsel's comments at oral argument, that the under-inclusion by HEK was not the result of bad faith, however. We recognize, moreover, that the under-inclusion might have been rectified had counsel for ORIX either informed HEK that the omitted items should be included in the extract or unilaterally included the items in the appendix to ORIX's brief. *See* Md. Rule 8–501(a) and (e). Likewise, the under-inclusion might have been rectified by order of this Court had this Court had the luxury of reviewing the briefs and record extract sufficiently in advance of argument. *See* Md. Rule 8–501(m). HEK has provided numerous citations to the transcript. Thus, while this Court must shoulder the burden of reproducing and distributing to the judges the relevant transcript pages, the relevant pages can, at least, be readily located. We shall therefore entertain the appeal despite the violation of Rule 8–501(c). *We caution the appellate bar that we may not be so accommodating in the event of future violations.*

counsel comply with the appellate rules. That has not changed with the softening of Rule 8–501(c) and (m).

## SUPERIOR SECURITY INTEREST

HEK sought, in the amended complaint, a declaratory judgment that ORIX's security interest in the scaffolding equipment was superior to that of Nationsbank. All of the other counts in the amended complaint were contingent upon a finding by the trial court that Nationsbank's interest was superior. HEK nevertheless dismissed Nationsbank from the case prior to trial. Although HEK did not amend the amended complaint, it then argued at trial that Nationsbank had the superior interest. HEK is now in the awkward position of appealing the trial court's determination that the security interest of ORIX was superior—the determination that, with its amended complaint, HEK requested that the trial court make. Thus, for the purpose, we hope, of ending this controversy, we shall assume *arguendo* that HEK is entitled to appeal from the exact determination that it sought in its amended complaint, and shall conclude that the determination was proper. We do not consider whether HEK may be estopped by its own pleading from arguing as it does. *Cf. Cloverfields Improvement Assoc., Inc. v. Seabreeze Properties, Inc.*, 280 Md. 382, 403–04, 374 A.2d 906, 907–09 (1977) (discussing binding nature of judicial admissions in *per curiam* denial of motion to reconsider opinion reported at 280 Md. 382, 374 A.2d 906).

At the time of the transaction, § 9–401 of the Commercial Law article provided, in pertinent part:

(1) The proper place to file in order to perfect a security interest is as follows:

. . .

(c) ... in the office of the Maryland State Department of Assessments and Taxation and in addition, if the debtor has a place of business in only one county of this State, also in the office of the clerk of the circuit court of such county, or, if the debtor has no place of business in this State, but resides in the State, also in the office of the clerk of the circuit court of the county in which he resides ...

. . .

By 1994 Laws of Maryland, chapter 720, the General Assembly amended § 9–401(1)(c) to require filing only with SDAT. *See* Md.Code (1975, 1997 Repl.Vol., 1999 Cum.Supp.), § 9–401(1)(c) of the Com. Law I Art. By its own terms, chapter 720 was to "take effect July 1, 1995," and "[i]t is a basic rule of statutory construction that '[a] statute is presumed to have prospective effect only unless there is a clear legislative intent that the statute operate retroactively.'" *Scroggins v. Dahne*, 335 Md. 688, 694, 645 A.2d 1160, 1163 (1994) (citation omitted). Thus, the parties do not dispute that, in order to perfect its purchase money security interest, ORIX was required to file with both SDAT and in Howard County, where Proceres had its offices. *See generally* Code (1975, 1997 Repl.Vol.), § 9–107(b) of the Com. Law I Art. (indicating that a purchase money security interest may be "[t]aken by a person who by making advances . . . gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used").

■ HEK contends that the scaffolding equipment was delivered to Proceres on May 23, 1994, and that, in accordance with Code (1975, 1997 Repl.Vol.), § 9–312(4) of the Com. Law I Art., ORIX had 20 days from that date to perfect its purchase money security interest. HEK concedes that ORIX filed the appropriate documents with SDAT on June 1, 1994—well within the 20–day limit—but argues that the Howard County filing did not take place until June 17 and thus was untimely. HEK argues that the trial court's determination that ORIX had the superior security interest was therefore clearly erroneous.

HEK acknowledges that, although the trial court did not explain the basis for its determination, the court must have determined either that ORIX did file its financing statement and filing fee in Howard County within 20 days of May 23, 1994, or that delivery did not occur on May 23 but at some later point. Because we find that the court could have proper-

ly reached either conclusion, we reject HEK's contention that the court's determination was erroneous.

### —Filing within 20 Days of May 23, 1994—

There is no dispute that the financing statement and check for the Howard County filing were not date stamped by the Clerk of the Court until June 17, 1994. That date, however, is not necessarily the date of filing.

Section 9–403(1) of the Commercial Law article provides: "Presentation for filing of a financing statement and tender of the filing fee or acceptance of the statement by the filing officer constitutes filing under this title." Code (1975, 1997 Repl.Vol.), § 9–403(1) of the Com. Law I Art. ORIX presented no direct evidence as to when it actually presented the financing statement and tendered the check. There was circumstantial evidence, however, that this occurred on or about June 1, 1994.

The checks that accompanied the financing statements filed with SDAT and in Howard County were consecutively numbered and were both dated June 1, 1994. ORIX's Baltimore branch manager, John Frank, testified at trial that the filings were handled pursuant to standard procedures, which meant:

> We would have cut the checks, attached them with the respective financing statement and mailed them to the appropriate authority, in this case, the Department of Assessments and Taxation and the Clerk of the Circuit Court for Howard County.

The statement and check sent to SDAT were stamped "received" on June 1, 1994. Frank indicated that he did not know the cause of the delay between the June 1 mailing and the June 17 date-stamping in Howard County, but indicated it was not due to any fault of ORIX.

It is not uncommon for a document mailed to a court to be set aside for a period of time and to be processed and stamped "received" at some more convenient point. With that in mind, the "Official Comment" to § 9–407, which prohibits a creditor

who charges a debtor for filing a financing statement from failing to actually file the statement, specifically explains that

under Section 9–403(1) the secured party does not bear the risk that the filing officer will not properly perform his duties: under that section the secured party has complied with the filing requirements when he presents his financing statement for filing and the filing fee has been tendered or the statement accepted by the filing officer.

Code (1975, 1997 Repl.Vol.), § 9–407 of the Com. Law I Art. (Official Comment No. 1). Indeed, as a general rule,

the secured party has no duty to insure that the officer properly performs his duties, and a statement is filed even if it is not properly indexed due to the error of the filing officer, or even if the statement is improperly rejected by the filing officer.

79 C.J.S. *Secured Transactions* § 72 at 473 (1995).

On the evidence presented, the trial judge may well have inferred that ORIX mailed both statements and checks on June 1 and that the statement was promptly "presented" in Howard County, but that the Clerk of the Court simply failed timely to stamp the items "received." Such a determination on the part of the trial court would not have been clearly erroneous. *See* Md. Rule 8–131(c). *Cf. In re Flagstaff Foodservice Corp.,* 16 B.R. 132 (Bankr.S.D.N.Y.1981) (where creditor in bankruptcy case provided proof that it mailed financing statement and fee to town clerk for filing and that statement and fee were received, but creditor could not show that clerk actually indexed financing statement, statement was nevertheless deemed filed upon presentation by mail and creditor's security interest was deemed superior to other interests).

## —Date of Possession—

In the alternative, the trial court may have properly determined that Proceres did not gain possession of the scaffolding equipment until some point in late June of 1994, such that

ORIX was not required to file its financing statement within 20 days of May 23, 1994 and the June 17 filing was sufficient.[6]

Section 9–312(4) of the Commercial Law Article provides:

A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected *at the time the debtor receives possession of the collateral or within 20 days thereafter.*

§ 9–312(4) of the Com. Law I Art. (emphasis added). '[I]t is well settled that for the purposes of § 9–312(4) [of the Uniform Commercial Code, on which § 9–312(4) of Maryland's Commercial Law Article is modeled,] 'possession' is equated with physical control of the collateral." *In re Badger Aluminum Extrusion Corp.*, 7 B.R. 251, 252 (Bankr.S.D.N.Y.1980) (rejecting argument that buyer of generator set possessed set when bare generator was delivered and holding that possession occurred when all integral equipment that comprised set was delivered). In *In re Automated Bookbinding Servs., Inc.*, 471 F.2d 546, 553 (4th Cir.1972), in interpreting § 9–312(4) of Maryland's Commercial Law Article, the United States Court of Appeals for the Fourth Circuit established that a buyer takes possession when "the last of the ... parts [are] delivered...." The court indicated that it was irrelevant that some outstanding contractual provisions—such as a requirement for installation by the seller—must be completed before the buyer can actually use the collateral. *See also In re*

---

**6.** HEK concedes that ORIX argued below that Proceres did not possess the scaffolding equipment until at least late June of 1994, but suggests that ORIX nevertheless waived its right to make an argument regarding possession on appeal by failing to include such an argument in its answer to the amended complaint or in its motion to dismiss the amended complaint. The record reflects that, in its answer, ORIX declined to confirm or deny, because of lack of information, HEK's statements regarding delivery dates. ORIX did *not* admit that Proceres possessed the equipment as of May 23, 1994. HEK presents no argument to the effect that the date of possession was an affirmative defense that was required to be raised in the answer or by pre-trial motion. *See* Md. Rule 2–323(g). We thus reject HEK's contention that the matter is not preserved for appeal.

*Winnett,* 102 B.R. 635 (Bankr.S.D.Ohio 1989) (relying on *Automated Bookbinding* and holding that the buyer of a mobile home received possession when the entire mobile home was delivered to his property and he could have had access to the home, even though the buyer had not yet chosen to make the down payment to, and receive the keys from, the seller); *In re South Atlantic Packers Assoc., Inc.,* 30 B.R. 836, 840 (Bankr.D.S.C.1983) (citing *Automated Bookbinding* for the proposition that, "[w]hen a piece of collateral consisting of several components is delivered over a period of time, possession is deemed to have occurred when delivery of the parts is complete").

HEK argues that the only evidence presented at trial established that all of the scaffolding equipment was delivered on May 23, 1994. It concedes that there was evidence that ORIX balked at prompt payment on the ground that HEK failed to deliver 300 mast bolts, and that payment was not made until after the bolts were delivered in late June. It asserts, however, that evidence was presented, through HEK's president, Eric Schmidt, and HEK's sales manager, Dennis Morgan, that the bolts *were* delivered on May 23 and that HEK merely sent more bolts in order to facilitate payment by ORIX. HEK argues that, in any event, there was uncontroverted testimony from Morgan to the effect that Proceres began using the scaffolding equipment as soon as it was delivered. HEK posits that, even without the 300 bolts, Proceres possessed the equipment within the meaning of § 9–312(4) on May 23, 1994.

HEK's argument ignores two letters, both dated June 30, 1994, that were entered into evidence at trial. The first letter was from Proceres's president, Wickham Zimmerman, to Schmidt. In it, Zimmerman complained of damage to a number of pieces of equipment, and observed that the previous week Proceres had discovered that 300 mast bolts had not been delivered. Zimmerman reminded Schmidt that Proceres was "purchasing complete functional units, not a bunch of parts off an inventory sheet." In a reply letter, Schmidt agreed to repair or replace the damaged equipment. As to

the bolts, Schmidt stated that HEK had "immediately delivered the difference" when the problem was reported the previous week.

Thus, contrary to HEK's assertions, there was evidence before the trial court that delivery of the scaffolding equipment was not complete until at least the end of June of 1994. Even if one could infer from Morgan's testimony that Proceres began using *all* of the equipment when it was delivered on May 23, the trial court was not required to accept that testimony. "Judging the weight of evidence and the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact." *In re Timothy F.,* 343 Md. 371, 379, 681 A.2d 501, 505 (1996). *See generally* Md. Rule 8–131(c). Of course, if the court determined that delivery occurred no earlier than the end of June, a June 17, 1994 filing would have properly perfected ORIX's purchase money security interest under § 9–312(4).

### BREACH OF WARRANTY OF TITLE

 In its amended complaint, HEK asserted that if the trial court determined that Nationsbank had the superior security interest, it should further determine that ORIX breached its warranty of title by conveying "goods [that] were not free of any security interest...." HEK now argues that, regardless of whether Nationsbank or ORIX had the superior security interest in the construction equipment, the trial court should have determined that ORIX breached its warranty of title by failing to act to remove the cloud on title created by Nationsbank's claimed lien. We shall assume *arguendo* that HEK is entitled to appeal from the court's failure to make a determination that HEK did not seek in its amended complaint. We conclude that HEK's argument is without merit.

The trial court did briefly address HEK's breach of warranty of title count, stating without elaboration that Nationsbank's claim to a superior security interest was not sufficient to support the count. It thus appears, as HEK suggests, that the court believed that a breach of warranty of title action

could properly be brought in connection with a transaction such as the 1996 transaction between ORIX and HEK, but that Nationsbank's claim to a superior interest could not support a breach of warranty of title action in the instant case because Nationsbank's claim was not colorable. *See generally Jefferson v. Jones,* 286 Md. 544, 554, 408 A.2d 1036, 1042 (1979) ("the warranty of title provided by section 2–312 of the Commercial Law Article does not require proof of a superior title in a third party in order to establish a breach of its provisions, but only a colorable claim or one that is not spurious").

As a matter of law, a breach of warranty of title action cannot properly be brought in connection with a transaction such as the 1996 transaction between ORIX and HEK. Thus, the trial court properly rejected the warranty of title count, but for the wrong reason. We affirm the trial court's decision as to the breach of warranty count and explain. *See Offutt v. Montgomery County Bd. of Educ.,* 285 Md. 557, 563 n. 3, 404 A.2d 281, 285 n. 3 (1979) ("An appellate court may, on direct appeal, affirm a trial court's decision on any ground adequately shown by the record, even though not relied on by the trial court or the parties.").

■ Section 2–312(1) of the Commercial Law Article provides that, in a contract for the sale of goods under Title 2 of the article, there is

a warranty by the seller that

(a) The title conveyed shall be good, and its transfer rightful; and

(b) The goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at time of contracting has no knowledge.

Code (1975, 1997 Repl.Vol.), § 2–312(1) of the Com. Law I Art. Contrary to HEK's contentions, however, the 1996 transaction did not involve a sale of goods, such that it fell within Title 2 of the Commercial Law Article. *See* Code (1975, 1997 Repl.Vol.), § 2–102 of the Com. Law I Art. (stating that Title 2 "applies to transactions in goods . . ."). Rather, it was an assignment

of chattel paper, such that it was governed by Title 9. *See* Code (1975, 1997 Repl.Vol.), § 9–102(1)(b) of the Com. Law I. Art. (stating that Title 9 applies, *inter alia*, to "any sale of accounts of chattel paper"). Title 2's warranty of title ordinarily does not apply to Title 9 transactions.

HEK contends that the 1996 transaction *did* involve the sale of the scaffolding equipment from ORIX to HEK. HEK points to testimony by Schmidt and Morgan, to the effect that HEK was not in the business of purchasing chattel paper but of manufacturing and marketing equipment, and that HEK saw the so-called "reassignment" as a means of purchasing the equipment. The trial court rejected this evidence and determined that the 1996 transaction was a reassignment of chattel paper, and we perceive no error. *See* Md. Rule 8–131(c).

As we recounted earlier in relating the facts of this case, Eric Schmidt of HEK summarized the 1996 transaction between ORIX and HEK in a letter dated November 19, 1996 to ORIX's Baltimore branch manager, John Frank. Schmidt characterized the transaction as a reassignment from ORIX to HEK of HEK's original assignment to ORIX of HEK's rights under the May 10, 1994 Conditional Sales Contract Note. The plain language of Schmidt's letter reflects that Schmidt understood that the transaction was a reassignment. Frank testified at trial, moreover, that both Schmidt and Morgan requested that ORIX repossess the equipment itself and sell it to HEK. Frank declined to do so, and informed Schmidt and Morgan that ORIX was interested only in a reassignment. There is no suggestion that HEK was unsophisticated and was unable to distinguish between a sale and an assignment. Frank testified that his notes reflected that at one point Morgan told him he intended to "check with" HEK's attorney regarding the reassignment. The evidence established that the balance paid by HEK to ORIX was not the value of the equipment but the balance due on the note by Proceres. HEK ultimately sold the equipment for $140,000.00.

HEK points out that, under the Conditional Sales Contract Note, title to the scaffolding equipment was to remain with the

holder of the note—HEK, then ORIX, then HEK—until all payments were made. HEK thus suggests that, by reassigning to HEK its rights under the Conditional Sales Contract Note, ORIX reassigned to HEK title to the equipment and thus effected a sale. Section 2–401(1) of the Commercial Law article makes clear, however, that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." As the Court of Appeals has explained,

"Where a seller retains title to the goods until paid and delivers possession of the goods to the buyer, the seller's interest is a security interest and is governed by Article 9.

"When it is the intention of the parties, an instrument which purports to relate to title will be deemed to create merely a security interest. Thus, although the transaction purports to reserve title to the seller, this reservation is limited to a security interest.

*Tilghman Hardware, Inc. v. Larrimore,* 331 Md. 390, 404, 628 A.2d 215, 221 (1993) (citation omitted).

Under Title 9, " '[c]hattel paper' means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. . . ." Code (1975, 1997 Repl.Vol., 1999 Cum.Supp.), § 9–105(1)(b) of the Com. Law I Art. Under § 9–105(1)(h), "[g]oods includes all things which are movable at the time the security interest attaches or which are fixtures . . ., but does not include . . . chattel paper. . . ." *Id.,* § 9–105(1)(h). Clearly, the reassignment constituted chattel paper, in that it reassigned rights under a note that evidenced both a monetary obligation and a security interest. There is no dispute that the 1994 assignment from HEK to ORIX, which was reassigned back to HEK in the 1996 transaction, was chattel paper and not goods. Significantly, HEK conceded below and concedes in its brief to this Court that the 1994 assignment "was not an article 2 transaction." Certainly, a reassignment of an assignment that "was not an article 2 transaction" could not itself be an article 2 transaction.

HEK asserts, in the alternative, that even if the 1996 transaction was not a pure sale of goods, it was a mixed transaction under Title 2 and Title 9, such that the warranty of title provided by Title 2 was applicable. HEK provides no real support for this assertion, and we find it to be without merit. As the trial court properly determined, the 1996 transaction involved only the reassignment to HEK from ORIX of ORIX's rights under the Conditional Sales Contract Note. The sale of goods occurred in 1994, between HEK and Proceres. A potential action by ORIX, as the assignee of HEK's rights under the note, against Proceres to recover on the note would indeed concern the underlying sale, such that both Title 2 and Title 9 of the Commercial Law article would come into play. *Compare Scott v. Ford Motor Credit Co.,* 345 Md. 251, 691 A.2d 1320 (1997) (where seller of automobile assigned sales contract to financing company, and financing company sued buyer for deficiency, four-year statute of limitations for suits on sales of goods, as set forth in § 2–725(1) of the Commercial Law article, was applicable). The underlying sale to Proceres would have had no relation, however, to any potential action between ORIX and HEK regarding the original assignment of the note. *Cf. United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 526, 561 P.2d 792, 795 (1977) (where automobile dealer assigned security agreement and note on contract of sale to bank, provisions of Title 2 of the Uniform Commercial Code, as adopted by Kansas, had no bearing on a suit between dealer and bank regarding the assignment). Likewise, the underlying sale had no relation to HEK's action against ORIX regarding the 1996 reassignment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI- MORE COUNTY AFFIRMED; APPELLANT TO PAY THE COSTS.**